## Commonwealth ex rel. Batturs, Appellant, v. Batturs.

Argued March 17, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Charles A. Rothman,* for appellant.

*Simon Shapiro,* for appellee.

OPINION BY ROSS, J., July 23, 1948:

This is a habeas corpus proceeding involving the twelve-year-old daughter of the relatrix and the respondent. The court below refused the relatrix's petition for custody of the child and she took this appeal.

The burden is upon the relatrix appellant to establish that the order of the court below dismissing her petition for custody is, under the evidence, manifestly erroneous or based on a mistake of law. *Com. ex rel. Ellmore v. Butler,* 84 Pa. Superior Ct. 291; *Com. ex rel. Brown v. Lane,* 90 Pa. Superior Ct. 350; *Com. ex rel. Zimbo v. Zoretskie,* 124 Pa. Superior Ct. 154, 188 A. 365.

The parties were married seventeen years ago and resided together until the relatrix left the home in January 1945. On February 21, 1945, she presented a petition for the custody of the child, Jerie, who then was living with the father at 7107 Boyer Street, Philadelphia, where she had lived since her birth. After a hearing on May 23, Judge BONNIWELL, who also heard the present proceedings, dismissed the petition on June 7, 1945, and awarded custody of the child to the respondent father. Later in 1945—the exact date does not appear in the record—the relatrix, who since she left the home on Boyer Street has been living with George Schneese at 134 Birch Avenue, Wilmington, Delaware, secured an uncontested divorce from the respondent and on March 26, 1947 was married to Schneese after a son had been born to them in October 1945. On June 3, 1947, the relatrix presented a second petition for custody, the one involved in this appeal, and after hearing, the court on July 2, 1947, dismissed the petition and allowed the respondent to retain custody of the child.

In disposing of this appeal it is for us to "consider the testimony and make such order upon the merits of

the case . . . as to right and justice shall belong". Act of July 11, 1917, P. L. 817, 12 PS 1874. In all cases involving the custody of a child, the governing criterion is the welfare and interest of the child. *Hixon's Appeal,* 145 Pa. Superior Ct. 33, 20 A. 2d 925; *Com. ex rel. Goldbaum v. Goldbaum,* 161 Pa. Superior Ct. 131, 53 A. 2d 746. "The cardinal consideration is ever the welfare of the child, which includes its physical, intellectual, moral and spiritual well being. To this the rights of parents and all other considerations are subordinate." *Com. ex rel. v. Daven,* 298 Pa. 416, 419, 148 A. 524; *Com. ex rel. Kreiling v. Kreiling,* 156 Pa. Superior Ct. 526, 530, 40 A. 2d 704. Where the dispute is between the father and the mother, the fitness of such parent to have custody of the child or children is to be considered as well as the best interest and permanent welfare of the child or children. Act of June 26, 1895, P. L. 316, sec. 2, 48 PS 92. As stated by Judge HIRT in *Com. ex rel. Martocello v. Martocello,* 148 Pa. Superior Ct. 562, 25 A. 2d 855, at page 563: "In cases of this kind, what is in the best interest of the child and his permanent welfare is to be decided, not in relation to a fixed standard, but by determining what is best for the child under all of the circumstances."

The relatrix, who lives with her present husband and their infant son in a two bedroom house on Birch Avenue, Wilmington, Delaware, testified that her husband, who is regularly employed by the Pennsylvania Railroad Company at an average weekly wage of "$80 to $90", is "willing" to have Jerie live with them, her testimony being as follows: "Q. Is your present husband, Mr. Schneese, willing to undertake to take this child in that home? A. Yes, he is. Q. And have her as a member of the household? A. Yes." It is significant to note that Schneese, presumably available, did not appear as a witness. The respondent lives in a three story semi-detached house in a good residential section of Philadelphia. There are three bedrooms on the second floor

and three on the third. The bedrooms on the second floor are occupied by the respondent, his father and Jerie, each having a separate room. The three rooms on the third floor are occupied by three employed male roomers. The respondent has been employed by the Pennsylvania Railroad Company for the past twenty-one years, his present hours being from 8:30 a.m. to 4:45 p.m. each day except Saturday afternoons and Sundays, when he is off duty. His father, a passenger conductor with the same company, leaves for his work at eleven o'clock in the morning, returning each night.

The relatrix objects to the environment of the respondent's home because "there is nothing but men in the household" and that Jerie is receiving "no personal care. She needs a woman's care". A witness on her behalf, Mrs. Blanche Heald, who was a housekeeper in respondent's home from July to November 1945, testified that "there was lots of vile language used there" and that "very vile jokes" were told in the presence of Jerie. The respondent and other witnesses denied that vile language in any way was used by him or others in the household. Mrs. Heald had been discharged by the respondent and admitted that she had left the household under "unpleasant circumstances". The trial court who saw and heard the witnesses apparently placed no credence in Mrs. Heald's testimony, and even from a reading of the cold record, her animosity toward the respondent and his father is so apparent that in view of the contradictory testimony given by other witnesses, her testimony is entitled to little—if any—consideration.

The respondent testified as follows relative to Jerie: "Q. Who prepares her meals? A. Just at the present time, while she is on vacation, Mrs. Kenny, the lady next door, has full care of her, gives her her breakfast and her lunch. As far as dinner is concerned, either I prepare it or we go out and eat. Q. Mrs. Kenny resides where, right next door to you? A. Yes, the adjoining

house. Our houses adjoin, a twin house. Q. Who prepared the child's meals prior? A. I gave her her breakfast, she went to school, she had her lunch with a family named Seiler directly across the street. She goes to school with the Seiler children, had a home cooked meal there." The respondent also testified that Jerie regularly attends public school, goes to Sunday school "every Sunday we are home", and is "a member of the Scout Troop there".

. Mrs. Kenny testified as follows: "Q. Since December 1945 what arrangements did you have with Mr. Batturs, if any, regarding the care of Jerie? A. I have a key to Mr. Batturs' home; I meet the child when she comes from school, see that she has her lunch, which she takes across the street with a neighbor, to see that everything is all right inside. .... Q. What care and attention, if any, do you give to Jerie? ... A. I keep watch over her." She also testified: "Q. Did you have an opportunity to observe Mr. Batturs' conduct toward his child? A. Oh, yes, I have seen Mr. Batturs and the child all the time. Q. How does he conduct himself towards the child? A. Very, very well—Mr. Batturs is very devoted" and that he is doing "the best in his power to raise the child". The witness described Jerie as being "very respectful towards me and anyone I have ever seen her with". Mr. Beverson, the respondent's immediate superior in his employment and with his wife a frequent visitor at the respondent's home, referring to him, testified as follows: "Q. What is his reputation for being a decent, moral man? A. Everybody—one of the finest, I think. Q. Did you ever have an opportunity to observe the conduct of Mr. Batturs towards his child Jerie? A. I have, plenty of times. Q. Tell his Honor the conduct of Mr. Batturs towards his child. A. I think he was one of the best parents I ever seen, he seemed to idolize the kid." The witness described Jerie as "a very nice little girl". Mrs. Beverson testified: "Q. What would you say was his conduct towards the child? A. I think

he is a very wonderful parent. Q. What is the behavior of the child towards you, to Mr. Batturs and other adults in your presence? A. Everybody that has ever met her thinks she is a wonderful child, very well behaved. Q. Do you know anything about her personal habits, care and attention? A. Yes sir, I do. Q. About herself? A. Well, she has always been very neat, well taken care of . . ."

From our examination of the record in this case, it is our opinion that the best interest and welfare of Jerie would be served by leaving her with the father rather than by taking her from a home and surroundings in which she has lived all her life, away from her school and church friends, into a home in another city, particularly since we know so little about the mother's present home, the record being silent as to its surroundings and its school and church facilities. It is apparent that the father—to the best of his ability in the circumstances —is providing a good home for his daughter and is caring for her "physical, intellectual, moral, and spiritual well being".

The evidence clearly supports the conclusion of the court below that the child should remain in the custody of the father and our review of the proceedings causes us to agree with that conclusion.

Order affirmed.