## Urbani *v.* Bates, Appellant.

188

Argued January 6, 1959. Before JONES, C. J., MUS-MANNO, JONES, COHEN and MCBRIDE, JJ.

*Henry B. Waltz, Jr.,* with him *James L. McWherter,* for appellant.

*Richard E. McCormick,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 24, 1959:

Arthur J. Urbani and Mary Lou Urbani became man and wife on October 20, 1950. On November 10, 1955, they became implacable foes through the medium of divorce. On April 9, 1956, Mrs. Urbani married Charles J. Bates, so that she is now Mrs. Bates. When Mrs. Bates left her husband, Arthur Urbani, on August 11, 1955, she took with her their two children, Sharon Ann Urbani, born January 20, 1953, and Michael James Urbani, born January 24, 1954. The Court of Common Pleas of Westmoreland County, through ap-

propriate proceedings, awarded the custody of these children to Arthur Urbani, the father; and, as a consequence, Mrs. Bates appealed to the Superior Court which affirmed the decision of the Westmoreland County court. We granted allocatur, and the decision as to who shall have the children now rests with this Court. One improvement on the historical Solomonic decision would be to divide the children, one to each parent, but that would be an expediency as unjust as the threatened division by sword.

When children are of a tender age, their place is with the mother, provided she be ready, able, and willing to raise them properly. The Urbani children at this writing are only 5 and 6 years old, respectively, and thus still within that age span when the chicks need the hen, the colt the mare, and the cub its mother bear. In the case of *Commonwealth ex rel. Blatt v. Blatt,* 168 Pa. Superior Ct. 427, the custody of two children, 6 and 7, were awarded to the mother. The Superior Court, in affirming the award, said: "The rule of law has often been reiterated that, in the absence of compelling reasons, the welfare of children of tender age is best promoted by giving custody to the mother."

In *Commonwealth ex rel. Keller v. Keller,* 90 Pa. Superior Ct. 357, the Superior Court said: "Ordinarily, the needs of a child of tender years are best served by the mother who, in the common experience of mankind, is better fitted to have the charge of it."

In the case of *Commonwealth ex rel. McMenamin v. McMenamin,* 171 Pa. Superior Ct. 524, 526, this rule was restated as follows: "No compelling reasons are exhibited by this record why the usual rule should not have been applied; namely, that children of tender years be awarded to the custody of their mother. We are convinced that the best interests and welfare of this child will be best served by maternal care and affection, no compelling reasons appearing to the contrary."

What were the circumstances in this case which prompted the Court of Common Pleas of Westmoreland County to take the infants (they were then only 2 and 3 years of age) away from the mother and give them to the father who, at the time, did not have a house large enough to comfortably accommodate them? His dwelling boasted only two bedrooms, one of which was occupied by himself; the other by his married sister and her husband. As against these restricted quarters, the mother offered with her new husband a habitation replete with three bedrooms, living room, bath, complete basement, and commodious playyard.

The Judge who heard the custody case, peremptorily awarded the children to Mr. Urbani at the end of the case and he did not write the opinion explaining his action until 17 months later, even after his term of office had expired.

We are satisfied, from a reading of the record, that the awarding of the children to their father, under the circumstances of the case, constituted an abuse of judicial discretion. Throughout all the testimony, which covers some 125 printed pages, not a word was uttered to the effect that Mrs. Bates was not a good mother. In fact, the evidence was all to the contrary. Even the father testified: "Q. Will you tell what their physical condition was as you observed it? A. I have no complaints about their physical condition; they are in good shape. Q. They are in good shape? A. Yes, they are physically. Q. Were they in good shape before your separation and divorce? A. Yes. Q. Will you tell us what their mental condition was, their mental attitude as you observed, during that period? A. Well, naturally they love their mother. Q. They loved their mother? A. Certainly."

Nor did the father find any fault with the manner in which the mother cared for the children while they

were still living together: "Well, physically the children were brought up fine, I have no complaints about the way she fed and dressed them."

Urbani's sister, Mrs. Emma Cronin, called by Urbani to testify in his behalf, said the children had been well mothered by Mrs. Bates. "Q. From your observation, what is their present physical condition? A. I have no complaints. . . Q. Would you say that they are of average intelligence and intellectually and normally developed for their age? A. I would say it was above normal."

Mrs. Fannie Wolf, a next door neighbor and who was also called by Mr. Urbani as a witness, testified: "Q. Are you a mother by any chance? A. Yes, I am. Q. Will you tell us based on your experience whether she neglected these children, as you observed? A. I wouldn't say she neglected them. Q. She wasn't neglecting them? A. No. . . Q. Do you have occasions to observe the Urbani children? A. Yes, quite often. Q. Just what did you observe in relation to their appearance? A. Oh, they were very finely clothed and she always kept them real nice and clean."

In the opinion filed by the lower Court on March 4, 1958, it said: "In determining the question of the custody of these two minor children their welfare is the governing criterion to which the rights of parents, and all other considerations, are subordinated, and the evidence must be reviewed in relation to the happiness, training and morals of the children. See Hixon's Appeal, 145 Pa. Superior Ct. 33."

This is a correct statement of the law but it was honored more in the breach than in the observance. The court seemed to have been influenced in its decision by something wholly irrelevant to the issue involved. It said: "The record in this case fails to disclose any misconduct on the part of Arthur J. Urbani, the plain-

tiff, which caused the separation of the parties or their divorce. He seems to have had the proper regard for his business and his family responsibilities. There is no evidence of any mistreatment or failure in any respect toward his family."

The rock on which a marriage splits is not the touchstone for determining the custody of children. A father can be a Sir Galahad in deportment and a Hercules in strength, and yet stand helpless before the task of feeding, changing, and dressing a one-year-old child. The father of the children here was unquestionably a dutiful husband, a good provider, and a conscientious worker. He owned a drug store where he spent practically all the daylight hours and most of the night hours. With the exception of two nights a week, he daily remained at the drug store until midnight.

These long absences from home created the void in which the foundation of the Urbani marriage structure began to sink. Mrs. Urbani complained about being left alone, and many arguments followed. Apparently having no philosophical training in these matters, Mrs. Urbani did not understand the joys of solitude and so she turned to the telephone for company. Occasionally she found that the telephone did not quite satisfy her longing for human society, and companionship took a more palpable form. She went out with girl friends and spent many hours with her sister who was in a hospital. Mr. Urbani testified that Mrs. Urbani's companions were not limited to those of her own sex.

It is to be said on Mr. Urbani's side of the controversy that Mrs. Urbani's behavior during this period was not such as to eclipse the renown which Mrs. Caesar has enjoyed down through the centuries, of having been above suspicion. Still, it cannot be said that she carried on in any manner which would justify Mr. Urbani's intimations that Mrs. Urbani's miscon-

duct went beyond Othello's suspicions about Desdemona.

In 1952 Mrs. Urbani left her husband for six weeks, hoping that a temporary separation between them might attenuate the frigidity of the cold war which had unofficially been declared between them. But when she returned to their common domicile it was not apparent that any fire of mutual faith had been kindled on the hearthstone of conjugal love. The quarrels resumed, and Mr. Urbani's jealousies flourished.

Mrs. Urbani related that on one occasion Mr. Urbani said that he would be satisfied to see her go out with a certain Joe Amadio and then he would know that she "didn't want him any more." Although this test seems to have accomplished the purpose for which it was intended, it did not improve the climate of reciprocal marital understanding. When Mrs. Urbani finally left her husband permanently and went to live in an apartment in Latrobe (they had been living in Jeannette), he hired a private detective to watch her apartment and he had her telephone wire tapped. He was assured that his distrusts were confirmed, but the record does not confirm that her conduct was such as to justify the lower court in saying that she was guilty of a "moral irresponsibility" which "raises doubts of her fitness to guide and promote the moral and spiritual well being of her children."

The Reverend Alfred Grotzinger, pastor of the church Mr. and Mrs. Urbani attended, testifying that he had visited the Urbani home before the couple separated, in the endeavor to effect an increased mutuality of love and affection between them, said: "She simply said she wouldn't live with him any more because of conditions; she claimed he stayed down in the store too late etc. and because of that she claimed that was the only reason she wouldn't live with him; she didn't

love him that was it. . . That seemed to be the big difficulty at the time and apparently at the time was the only difficulty according to her claims; I specifically asked her whether there was any other difficulties, particularly in regard to another man, etc. It was absolutely denied that there was any other man involved."

The lower court said that Mrs. Bates' testimony "insinuates a meretricious relationship which she did not even attempt to deny or explain." We do not believe that the testimony goes as far as the court assumed, but there can be no doubt that, as we have already stated, Mrs. Bates' conduct would not make her a rival for the niche occupied by Calpurnia in the history of connubial impeccability. However, whatever it was, it never encroached upon her full-hearted devotion to the welfare of her children. As far back as 1816, in the case of *Commonwealth v. Addicks and wife,* Chief Justice TILGHMAN, speaking for this Court, said: "We cannot avoid expressing our disapprobation of the mother's conduct, although so far as regards her treatment of the children, she is in no fault. They appear to have been well taken care of in all respects. It is to *them,* that our anxiety is principally directed; and it appears to us, that considering their tender age, they stand in need of that kind of assistance, which can be afforded by none so well as a mother." The children in the *Addicks* case were, respectively, aged ten and seven years, thus in both instances older than the Urbani children, even as of the present date.

In the case of *Commonwealth ex rel. Blatt v. Blatt,* supra, the Superior Court said: "The relator offered some evidence reflecting upon his wife's infidelity. This is not too persuasive, but even if true it does not constitute a compelling reason as to children of this age." The children in the *Blatt* case were six and seven years of age.

In seeking reversal of the decision of the Superior Court, which affirmed the decision of the Court of Common Pleas of Westmoreland County, counsel for Mrs. Urbani devoted considerable time at the oral argument and extensive space in his brief to the proposition that the lower court's findings of fact and assignment of reasons for its order were a nullity because they were filed after the judge's incumbency in office had terminated. The judge awarded the children to Mr. Urbani on September 28, 1956. The appeal to the Superior Court was taken on October 10, 1956. The Judge's term was to end on January 5, 1958.

It is difficult to understand why the hearing Judge, knowing that an appeal was pending, and knowing that his ship of service would, in the matter of a year or so, be in home port, did not clear the deck of all unfinished tasks which had accumulated during the voyage. It will always be a mystery to the present opinion writer why a judge, being fully aware that he has tried a case and being cognizant of the fact that he must decide the issue involved, or, having decided the issue, must write an opinion for the benefit of the appellate court, will allow moss to accumulate on the papers, forming an additional barrier which he must penetrate in order to get to the core of the problem in controversy.

If there is little excuse for protracted delay in disposing of a case while a judge has still a long time to serve, there is even less excuse for procrastination when he is about to close his desk and pick up his brief case for the last time. However, apart from the question of fidelity to one's duties, a retarded filing of opinion or a decision can work confusion and embarrassment in the orderly disposition of the court's business. The opinion in this case was not filed until 17 months after the decision was originally rendered and 56 days after the judge's term of office had expired.

196

It is not necessary to decide whether the opinion filed on March 4, 1958, had any legal effect or not because this Court has inherent powers to pronounce decisions in custody cases. In the *Addicks* case, supra, Chief Justice TILGHMAN said: "We are not bound to decide who is entitled to the guardianship, or to deliver infants to the custody of any particular person. But we may in our discretion do so, if we think that, under the circumstances of the case, it ought to be done. For this we refer to the cases of The King v. Smith, 2 Stra. 982, and The King v. Delaval, 3 Burr. 1436."

Thus, after studying the record of the exhaustive hearing held in this case, we decide that, considering the tender ages of Sharon Ann Urbani and Michael James Urbani, their best interests will be served by being placed in the care of their mother, Mrs. Mary Lou Bates.

The decision of the Superior Court is reversed and the record is remanded with direction to the Court of Common Pleas of Westmoreland County to enter an order not inconsistent with this opinion, allowing rights of visitation to Mr. Urbani for not less than two days each week.