Commonwealth ex rel. Zeedick *v.* Zeedick, Appellant.

Argued June 14, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Anthony S. Guido,* with him *Gleason, Cherry & Guido,* for appellant.

*R. Edward Ferraro,* for appellee.

OPINION PER CURIAM, September 12, 1968:
Order affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:

John D. Zeedick, appellee-father, and Betty Jean Zeedick, appellant-mother [now Betty Jean Turley] were married in Jefferson County, Pennsylvania, on May 28, 1957. The parties resided in Jefferson County after the marriage, where their two children were born, Jacquelyn on April 21, 1958, and Ruth Ann on August 23, 1959.

In September, 1963, the parties separated. The father took Ruth Ann to live with him and Jacquelyn continued to reside with the mother. Each parent filed habeas corpus petitions for the custody of the child in the other's possession. The cases were heard together before the Court of Common Pleas of Jefferson County on December 20, 1963 and on September 11, 1964. The court did not enter an order, however, until August 31, 1966.[1] That order granted custody of Jacquelyn to the mother, with visitation rights to the father. Ruth Ann remained in the custody of the father pursuant to agreement of counsel. No court order was made as to the custody of Ruth Ann, nor did the mother have any visitation rights as to Ruth Ann.

The mother did not visit with or have custody of Ruth Ann from September, 1963, with the exception of two weeks during the month of August, 1966, until the weekend of March 10, 1967. At that time, it was arranged that the mother would have custody of both children for the weekend. When she obtained custody, she took the children, without notifying anyone, to the home of her parents in the State of Oregon.

Approximately one month later, the father went to Oregon to regain custody of the girls. He contacted the school authorities and a district attorney in Oregon to locate the children. Upon gaining custody of the girls during school hours, he flew them back to Pennsylvania, without gaining the permission of the mother or any authorities in Oregon.

Shortly thereafter, the father filed a petition for modification of the custody of Jacquelyn, and on stipulation of counsel, the custody of both children was put into issue. Hearings were held on July 10 and 11,

---

[1] During the above proceedings, the parties were divorced on May 14, 1964.

1967, in the Court of Common Pleas of Jefferson County. On September 7, 1967, the Court entered an order granting custody of Jacquelyn and Ruth Ann to the father, with the right of the mother to have the children during the summer months upon filing a bond in the sum of $1000.00.

The lower court should be commended for its patience in handling this case and for its lengthy opinion to support its order. The court felt that the best interests of the children would be served by awarding their custody to the father. The Court stated specifically: "This Court has no doubt about the concern of the father for his children, and the testimony amply supports his contention that the welfare of the children has been his primary concern. However, the Court does have some reservation as to the good faith, intent and concern of the mother for her children, especially when considering the testimony of the husband as to the late hours kept by the wife, as well as her statement that she did not realize she was in violation of the Court Order of August 11, 1966, in removing the children from the jurisdiction of this court without the consent or knowledge of this Court, necessitating the husband to go to great pains and expense in order to return the children to this jurisdiction."

In reviewing child custody proceedings, the appellant, the mother in the case at bar, has the burden of establishing that the lower court's order was erroneous in fact or was based on an error of law. *Commonwealth ex rel. Wagner v. Wagner,* 193 Pa. Superior Ct. 40, 163 A. 2d 708 (1960). Since the lower court has the advantage of seeing and hearing the parties, we must accord the custody order much weight. But, we must also review the record and make an independent judgment on the merits. *Commonwealth ex rel. Schofield v. Schofield,* 173 Pa. Superior Ct. 631, 98 A. 2d 437 (1953).

In custody cases, the paramount consideration is the welfare of the child, and all other considerations are subordinate to the child's physical, intellectual, spiritual, and emotional well being. Or, as Justice MUSMANNO stated in *Commonwealth ex rel. Ruczynski v. Powers*, 421 Pa. 2, 5, 219 A. 2d 460 (1966), "In determining the custody of a child of tender years, there is only one polestar, one compass, one standard of reasoning to follow, and that is the best interest of the child." There are a legion of cases which have asserted this doctrine. See, e.g., *Commonwealth ex rel. Batturs v. Batturs*, 162 Pa. Superior Ct. 573, 60 A. 2d 610 (1948); *Commonwealth ex rel. Goldbaum v. Goldbaum*, 161 Pa. Superior Ct. 131, 53 A. 2d 746 (1947); *Commonwealth ex rel. Ashfield v. Cortes*, 210 Pa. Superior Ct. 515, 234 A. 2d 47 (1967); 67 C.J.S. Parent and Child §12, at 653, n. 54.

The age and sex of the child is a keystone factor in any custody determination. In this case, we are dealing with young daughters. Our Court has, in such cases, followed a time-honored rule that the care and custody of a child of tender years, especially if the child is a girl, should be committed to the mother. *Urbani v. Bates*, 395 Pa. 187, 149 A. 2d 644 (1959); *Commonwealth ex rel. Horton v. Burke*, 190 Pa. Superior Ct. 392, 154 A. 2d 255 (1959). Our Court affords great credence to this concept because experience has taught us that young girls need maternal care and affection. A mother can explain the processes of maturation and sexual knowledge to growing daughters better than a father. Experience has also taught us that a girl's psychological and social adjustments to her environment are more easily made through the confidence of a mother-daughter relationship. As a result of this knowledge, we have often reiterated that, absent compelling reasons, the needs of a daughter of

tender years are best served by awarding custody to the mother. *Commonwealth ex rel. Keller v. Keller,* 90 Pa. Superior Ct. 357 (1927); *Commonwealth ex rel. Blatt v. Blatt,* 168 Pa. Superior Ct. 427, 79 A. 2d 126 (1951). It is also noteworthy that most other states follow a comparable rule that a mother has preference over a father for custody of a child of tender years. See cases collected in 67 C.J.S., Parent and Child §12(b), at 654, n. 62.

Admittedly the rule enunciated above is not absolute, and the paramount concern remains the welfare and best interests of the child. But, in order to divest a mother's custody of her daughters, there must be compelling or very special reasons. Our Supreme Court in *Austin Adoption Case,* 426 Pa. 441, 233 A. 2d 526 (1967), recently amplified the requisite conduct necessary to deny a mother custody of a child of tender years. There, the Court stated: "Every precept of the law, as well as every instinct and rule of reason, dictate that a child of tender age should not be taken from its mother *unless brute circumstances* dictate that the child would fare badly with the mother. *Nothing less than gross, inexcusable neglect, coupled with evidence of unconcern and irresponsibility toward meeting the duties devolving upon a mother in raising her child can take her offspring away from her.*" at 443. [Emphasis added]

Our Courts have rigidly followed this principle and have been loathe to award custody of children of tender years to a father in absence of a mother's highly offensive and immoral conduct, which will have a highly detrimental effect upon the children. For example, in *Commonwealth ex rel. Jacobson v. Jacobson,* 181 Pa. Superior Ct. 369, 124 A. 2d 462 (1956), our Court awarded custody to a mother who had a previous history of drug addiction. The Court took cognizance of

the fact that her struggle to reach a cure was "less than heroic." Nevertheless, the Court felt that at the time of the hearings, the mother was poised and that the record indicated that she had made some earnest attempts to seek medical relief. On that basis, the court gave heed to the rule that a child of tender years should be with the mother and entered an order to that effect.

In *Commonwealth ex rel. Gervasio v. Gervasio,* 188 Pa. Superior Ct. 95, 145 A. 2d 732 (1958), the appellant-husband alleged that his former wife, had lived in an adulterous relationship in the presence of her children. The Court said that even this moral lapse in the past was not sufficient conduct to deny a mother custody of her young son and daughter. A similar claim was made in *Commonwealth ex rel. Staunton v. Austin,* 209 Pa. Superior Ct. 187, 223 A. 2d 892 (1966). Our Court said, "Certainly, such a relationship is not to be condoned, in our society." at 194. Yet, we emphasized that claims of close sanguinity outweigh such conduct and does not, in such a case, render the mother unfit for purposes of custody of the child. In that case, the mother was not only living in an illicit relationship at the time of the hearing, but also had a prior history of mental illness. Our Court stated that: "It is true, of course, that neither doctor predicted that Mrs. Staunton would never again suffer from mental depression." at 193. Nevertheless, our Court, in affirming the order awarding custody of the children to Mrs. Staunton, stated that even such an impediment was not sufficient to deny her custody. This decision was made in light of her prior mental history, where she spent extended periods of time away from her children, and the possibility of further periods of hospitalization for treatment of her illness.

In light of this precedent, the conduct of Mrs. Zeedick falls hopelessly short of that necessary to deny her custody of her two young daughters. The record is replete with contradictory and vague testimony, which fails to denote any moral depravity in Mrs. Zeedick's character. No specific acts of moral turpitude, which could impair the physical, intellectual, spiritual, and emotional well-being of the children were proven. There has been no showing of abandonment or neglect; no lack of maternal love; no abysmal character traits to render Mrs. Zeedick an unfit mother within the eyes of the law. Her relationship with the young girls appears to have been quite normal, and does not reflect any estrangement or hate. Furthermore, there is no indication that she neglected or abused her children in any way. The fact that the girls often wore old clothing to romp around the in-laws farm does not indicate neglect, nor is there any indication that the children were denied maternal care and love in their homelife.

The record further illustrates the type of home established by Mrs. Zeedick. The Director of Child Welfare for Jefferson County testified she had visited the home and stated that: "Her home was clean and comfortable." [NT 247]. She further testified that Jacquelyn, the daughter living with Mrs. Zeedick was ". . . a very vivacious, pleasant little girl," and that "she appeared happy . . ." [NT 248]. It should be noted that these visits were made subsequent to the separation of the parties. This testimony was further substantiated by several other witnesses. They stated that Mrs. Zeedick always kept a clean home [NT 448, 457] and that Jacquelyn was a happy, well-adjusted child. [NT 16, 448, 457]

Another witness stated that Mr. Zeedick was suspicious of his wife and asked several people to watch

her. That witness was asked to follow Mrs. Zeedick and stated:

"Q. Now, did you ever see her doing anything improper?

"A. No, we did not.

"Q. Did you observe the condition of her home [prior to the separation]?

"A. She has a lovely home." [NT 160]

. . .

"Q. Now, was she good and kind to the children or mean to them?

"A. No, her children behaved very well and they listened well . . .

"Q. Did she keep them well-clothed—

"A. Well, their clothes were always clean, to the best of my knowledge." [NT 160-161]

The same witness reported that her husband followed Mrs. Zeedick, at Mr. Zeedick's request, into the town. Mrs. Zeedick had told Mr. Zeedick that she was going to a bakery sale. Mr. Zeedick suspected that she was going to meet another man or to go drinking. The witness' husband subsequently found Mrs. Zeedick in the company of her girl friends having a cup of tea. [NT 163]

Moreover, Mrs. Zeedick has worked almost continuously since the marriage and has contributed greatly to the upkeep of the home and the financial needs of her children [NT 112-113, 347-349]. The record indicates that she had two jobs while living in Pennsylvania, and has obtained employment in the state of Washington. It is interesting to note that Mr. Zeedick testified that he earned about $3500 per year, or approximately $300 per month, while Mrs. Zeedick, after moving to Washington, had earned over $500 per month. Although financial ability to sustain two young daughters is by no means an ultimate criteria

in determining custody, it does lend some weight, especially where the wife earns more than her husband.

Upon these facts, there is nothing in this record, in my opinion, to indicate that Mrs. Zeedick's conduct even begins to approach that type of conduct for which our Courts have divested a mother of custody of her children. There were no moral lapses proven or even incidents from which reasonable inferences could be drawn. Accordingly, there are not sufficient facts to overcome the presumption that a mother should be awarded custody of her young daughters. The majority, by affirming the lower court's order, granting custody to the father, fails to take cognizance of the time-honored rule to which we, as well as all other states, have paid august homage over many years. I would remand and order the lower court to award custody of the daughters to the mother.

In reaching this conclusion, I find it necessary to briefly comment on the disposition by the lower court.

The lower court placed great weight on the fact that Mrs. Zeedick removed her daughter Ruth Ann from Pennsylvania to Oregon in contravention of a court order. It must be emphasized that Mr. Zeedick had been able to visit with his daughter Jacquelyn in the custody of Mrs. Zeedick from 1963 to 1967, pursuant to a court order but Mrs. Zeedick did not have such reciprocal rights as to Ruth Ann. Consequently, she had only seen her daughter once or twice prior to the time that she took her to Oregon. Furthermore, it must be noted that Mrs. Zeedick's own family was from the states of Oregon and Washington. She desired to set up a home near to her own family in order to rear her daughters together. The record substantiates this point. She placed her daughters in schools in Oregon while they lived with her mother, a short distance from her apartment. Mrs. Zeedick found a

well-paying job, and testified that she intended to set up a household with her daughters soon so that she and her daughters could live together. [NT 345]

It is also crucial to note that Mr. Zeedick took the children from Oregon to Pennsylvania in a clandestine manner, as Mrs. Zeedick took them to Oregon. He went to the school authority and asked to see his daughters. The depositions of Mr. Eugene Fox, the superintendent of the children's school district, and a district attorney, Mr. Richard J. Courson, indicate that Mr. Zeedick, after obtaining possession of the children, just took them away without the approval of any official in the State of Oregon. In fact, Mr. Fox had told Mr. Zeedick that he didn't feel he could release the children, and that he specifically did not give Mr. Zeedick authority to take them. Mr. Courson also stated that Mr. Zeedick was given no authority to take the girls back to Pennsylvania. At best, then, Mr. Zeedick's self-help methods, were, in reality, no better than Mrs. Zeedick's conduct, and both parties were equally guilty of nothing more than a sincere and misguided desire to have custody of the young daughters. It is, therefore, impossible for me to conceive of the lower court considering Mrs. Zeedick's actions as a "compelling reason" to deny her custody of the children. No case in our Commonwealth supports such a proposition.

The fact that Mrs. Zeedick testified that, if awarded custody of the girls, she would live in Oregon or Washington is of little or no consequence. Our Courts have said that removal of a child to a home outside of Pennsylvania is not a controlling factor in making an award of custody. Where a mother desires custody and is a nonresident, we have felt that, absent compelling reasons noted previously, she should be awarded custody. See *Commonwealth ex rel. Finney v. Mur-*

*phy*, 175 Pa. Superior Ct. 364, 104 A. 2d 348 (1954); *Commonwealth ex rel. Firestone v. Firestone*, 158 Pa. Superior Ct. 579, 45 A. 2d 923 (1946). Decisions in other jurisdictions comport with this rule and hold that only in a very extreme or special case will a court be induced to interfere with a mother's right to custody when the child may be moved from the jurisdiction. See, e.g., *Workman v. Workman*, 191 Ky. 124, 229 S.W. 379 (1921). Where a court fears that the home outside of the Commonwealth will not be as conducive to proper rearing of the child, then, removal may play a factor. But here, the record demonstrates that the mother established a clean home in Pennsylvania which afforded her children the type of maternal love and affection they needed. There is no indication that the home she intends to establish in another jurisdiction would be any different.

Another guideline used by our Courts has been the present possession of the child. *Commonwealth ex rel. Kraus v. Kraus*, 185 Pa. Superior Ct. 167, 138 A. 2d 225 (1958). However, the fact that one who has had possession has become attached to the child will not preclude an award where the court feels the paramount interest of the child will be best served by placing it with the other parent. In the instant case, Mrs. Zeedick had custody of Jacquelyn from the separation in September, 1963 until some time in April, 1967. Mr. Zeedick had custody of the other daughter, Ruth Ann, for the same period. Since September 7, 1967, both daughters have been in the custody of the father. Although present possession of a child is entitled to some weight, it is of little importance here. Both parents had custody of one child for a period of approximately four years. Only since the lower court order has Mrs. Zeedick been legally divested of custody of her daughters. In light of these facts, it is impossible to say that

either parents' custody in the past creates a presumption that either had present possession, so as to be a pre-determinative factor in the entry of an order.

The lower court also stated that it talked with the children and they told it that they preferred to stay with the father. Our Courts have opined that if a child is sufficiently intelligent, its preferences and attachments are to be consulted in determining its custody, but are not controlling. See *Commonwealth ex rel. Goldbaum v. Goldbaum*, supra; *Commonwealth ex rel. Horton v. Burke*, supra. When a child is eight years or under, our courts have paid little attention to its choice; when a teenager, more weight has been accorded its opinion. See *Commonwealth ex rel. Shamenek v. Allen*, 179 Pa. Superior Ct. 169, 116 A. 2d 336 (1955). At this writing, the girls are 10 and 9, and are neither teenagers nor totally incompetent to make a choice. Granted, their preference is some value. Even though the lower court discussed the matter with the children there is nothing on the record, however, to permit us to adequately review the weight it put on such conversations particularly in consideration of the ages of the children. In order to afford this factor more weight in making a determination, I would require something of record; but the lower court's opinion on this matter must be accorded some weight in the determination of this case.

In conclusion, I would find that Mrs. Zeedick is a fit and proper mother and should be awarded custody of her two daughters, with visitation rights afforded to Mr. Zeedick. None of the lower court's reasons supporting its award are compelling enough, in my opinion, to award custody to Mr. Zeedick, and to do so completely ignores the fundamental concept of all child custody cases in our Commonwealth and all other states of the union—children of tender years, especially

daughters, should be awarded to the mother. I would, therefore, vacate the order of the lower court and remand the case with instructions in accordance with opinion.

SPAULDING, J., joins in this dissenting opinion.