395 A.2d 273

**Brooks N. TREFSGAR**

v.

**Lois N. TREFSGAR, Appellant.**

Superior Court of Pennsylvania.

Argued June 16, 1978.

Decided Nov. 3, 1978.

Reargument Denied Dec. 29, 1978.

2

Henry O. Heiser, III, Gettysburg, for appellant.

Bernerd A. Buzgon, Lebanon, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

CERCONE, Judge:

This is an appeal from the order of the Common Pleas Court of Lebanon County which awarded the custody of a minor child, Lea Brooks Trefsgar, to her father, Brooks Trefsgar. The mother of the child, Lois Trefsgar, filed exceptions to the order which were dismissed nine months after they were filed. The mother appealed. We reverse the order of the lower court and award custody to the mother.

The parties were married in 1967, and their only child, Lea, was born that year. Both parties testified to marital strife which began shortly after their marriage. In January, 1976, after approximately fourteen marriage counselling sessions, appellant decided to leave the marital domicile and take Lea, their child, with her. Appellant eventually settled in Maryland where she began custody proceedings. Appellant was granted custody pendente lite, and appellee was served with a notice of the order and rule to show cause within 30 days of that service. Appellee obeyed the order from February through September of 1976 by returning Lea to her mother in Maryland after the exercise of every other

weekend visitations in Pennsylvania. However, in September, 1976, appellee retained Lea for an extra day and threatened to keep her in Lebanon. Appellant persuaded him to return Lea to Maryland, whereupon a decree pro confesso was entered in an award of custody to the mother. According to the docket entries from the Maryland proceedings, a certified copy of which was introduced into evidence,[1] notice of the entry of the decree pro confesso was sent to the father. However, on his next weekend visitation, he retained Lea and instituted these proceedings in Lebanon County to procure permanent custody of Lea in himself.

At the custody hearing in Pennsylvania, Mr. Trefsgar testified that he was a college graduate, that he was self-employed in the insurance business and earned approximately $26,000 per year. His work schedule involved a five-day work week beginning each day at 9:00 A.M. and ending between 4:00 and 5:00 P.M.; he rarely worked evenings. He lives in a home he purchased, in a residential neighborhood. He testified that Lea dresses herself, and he then takes her to school. They eat some meals at home and others at his father's restaurant. Finally, Mr. Trefsgar said he takes Lea to church, and that they also enjoy athletic activities such as bicycling, swimming, tennis.

Mrs. Trefsgar testified that she is also a college graduate and is employed as a sales representative for a communication consulting company. Her working hours are 9:00 A.M. until 5:00 P.M., five days per week. She resides in an

1. The docket entries from the Maryland proceedings that were presented before us ended with the decree pro confesso dated September 27, 1976, which awarded custody to the mother. Subsequently, appellee added to the appellate record the Memorandum and Order of the Circuit Court of Howard County, Maryland, dated August 3, 1978, whereby this court learned the final custody award to the mother from the Maryland court was not entered until December 8, 1976. This was *after* the Pennsylvania order of November 12, 1976 which granted custody to the father. Due to this sequence in dates, the Maryland court sustained the father's demurrer and dismissed the mother's complaint against him thereby giving full faith and credit to the Pennsylvania order awarding custody to the father. Since this August 3, 1978 order of the Maryland court did not look to the merits of the case as we do, it does not change our decision here.

apartment complex in Columbia, Maryland, which is near two recreational areas, an elementary school and shopping center. Although Lea was not enrolled in Sunday school in Maryland, Mrs. Trefsgar explained that she would be soon and that Lea received spiritual training in the home since Mrs. Trefsgar had taught Sunday school at one time. The activities in which the child and her mother engaged included crafts, attending concerts, visiting the library, walking, and kite flying.

Several witnesses testified on behalf of each parent and indicated that they both loved the child and were fine parents. Lea's teachers from her school in Maryland testified that both parents had personally contacted them concerning Lea's progress in school. They testified further that Lea was well adjusted, of above average intelligence and maturity, and got along well with other children.

Upon questioning by the judge, Lea said she could not choose between her parents concerning with which she would rather live. She testified she had a lot of friends in Columbia and participated in an after-school program. Lea complained that her paternal grandmother said unnice things about her mother, but that she liked Lebanon as well as Columbia and would be willing to visit either parent on the weekends. If forced to make a choice, Lea said she would choose to live in Lebanon only because she had more friends there and that there were more things to do. The judge specifically clarified that Lea's preference referred to a location and not a person.

Based on this evidence, the lower court decided the best interests of the child could best be served by awarding custody to her father. In his opinion, the lower court judge stated that Mrs. Trefsgar showed a "lack of conscious concern for Lea's emotional needs in time of crisis," and that she demonstrated "a lack of genuine and complete solicitude for her daughter." The lower court drew these inferences from incidents where Mrs. Trefsgar took Lea to dinner or sailing with a male friend of hers and his daughter, an emotional phone call between mother and daughter when

Mr. Trefsgar retained Lea in Pennsylvania, and Mrs. Trefsgar's failure to enroll her daughter in Sunday school. The court felt this demonstrated "an emerging pattern of her reactions to Lea's needs in times of extremis" which would not serve Lea's best interests. The court refused to consider that Mr. Trefsgar had violated the Maryland court order by retaining Lea in Pennsylvania because the court believed Mrs. Trefsgar was as equally guilty of violating the status quo in removing Lea from the marital domicile at the time the parties separated.

In reviewing an award of child custody, our paramount concern is the best interest of the child. The burden is on the appellant to establish that the lower court's order was erroneous in fact or based on an error of law. "Since the lower court has the advantage of seeing and hearing the parties, we must accord the custody order much weight. But, we must also review the record and make an independent judgment on the merits." *Commonwealth ex rel. Zeedick v. Zeedick*, 213 Pa.Super. 114, 117, 245 A.2d 663, 665 (1968). Although we may not nullify the fact finding of the court below, we are not bound by inferences drawn by the lower court that are not supported by the evidence. *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 147, 331 A.2d 665 (1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973); *Commonwealth ex rel. Bowser v. Bowser*, 224 Pa.Super. 1, 302 A.2d 450 (1973). In our independent review of the evidence we cannot agree that the best interests of the child are served by awarding custody to her father.

Primarily, we disagree with the inferences drawn by the lower court in its opinion. We do not feel, as did the lower court, that the fact that Mrs. Trefsgar removed Lea from the home cancels out the act of Mr. Trefsgar's violation of the Maryland court order. "In determining whether custody of a minor child should be given to her father or mother only the welfare of the child and not the question of which of the parents is to blame for the failure of the marriage should be considered." *Commonwealth ex rel.*

*Horton v. Burke,* 190 Pa.Super. 392, 396, 154 A.2d 255, 257 (1959). When Mrs. Trefsgar left the marital domicile, the child had to go somewhere and she felt Lea would be best cared for with her. The mother then went through the necessary legal channels to secure permanent custody of the child and was successful. The father chose not to contest the custody decree *pro confesso* and denied receiving notice of the order, although the docket entries indicate he was so notified. Hence his actions were in direct contradiction of the law and should have been recognized by the lower court. Just as Mrs. Trefsgar submitted to the jurisdiction of the court of Pennsylvania to fight for the custody of Lea, Mr. Trefsgar could have legally argued for Lea when afforded the opportunity prior to the Maryland decree *pro confesso.* See *Commonwealth ex rel. Blank v. Rutledge,* 234 Pa.Super. 339, 344, 339 A.2d 71 (1975).

 We also disagree with the lower court's inference that the mother's actions demonstrated a disregard for the child during a time of crisis. We agree with the lower court that any separation from one parent by a child of tender years may create emotional trauma. However, the testimony clearly indicates that Lea had adjusted to her new surroundings, was doing well in school, and had made many new friends. The incidents relied upon by the lower court concerning the mother's behavior are far from making her an unfit mother. Instead, we see the evidence as demonstrating a young mother, trying to make a new life for herself and her daughter, by moving to Maryland and obtaining an order to secure the custody of Lea. Lea's stated preference to be in Lebanon only relates to her familiarity with the location and, since she is a child of tender years, should not be given great weight. *Commonwealth ex rel. Baisden v. DeMarco,* 215 Pa.Super. 38, 41, 257 A.2d 365 (1969). Based on all the evidence presented, we do not find support for the lower court's conclusion that the mother had demonstrated a lack of concern for her daughter during this difficult time.

We do not defer to the tender years presumption in reaching our decision, and we specifically disregard any mention of it in the briefs or the opinion of the lower court since it no longer is applicable in Pennsylvania. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977). When looking at the evidence as presented, absent the inferences and conclusions drawn by the lower court which we find are not supported by the evidence, we conclude the best interests of the child would best be served by maintaining the status quo established by the mother under the Maryland decree *pro confesso*. We cannot ignore nor condone the acts of the father in violation of that decree.

Order of the lower court reversed and custody awarded to the mother.

SPAETH, J., files a concurring opinion.

PRICE, J., files a dissenting statement, in which VAN der VOORT, J., joins.

HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring:

Plainly, this is a difficult case. I think, nevertheless, that we should reverse; but as my reasoning is somewhat different than Judge CERCONE's, I offer this opinion.

I quite agree with Judge PRICE, that the hearing judge has complied with our requirements that the record be complete, and that we be given the benefit of a comprehensive opinion thoroughly analyzing that record. *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976); *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). Also, I recognize that we owe a duty of deference to the hearing judge, who, unlike us, has had the advantage of seeing the child, or children, the contesting parents, and their respective witnesses. *Burston v. Dodson*, 257 Pa.Super. 1, 390 A.2d 216 (1978); *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In Interest of Clouse*, 224 Pa.Su-

per. 396, 368 A.2d 780 (1976); *Clair Appeal,* 219 Pa.Super. 436, 281 A.2d 726 (1971). *Accord: Commonwealth ex rel. Doberstein v. Doberstein,* 201 Pa.Super. 102, 192 A.2d 154 (1963); *Commonwealth ex rel. Dinsmore v. Dinsmore,* 198 Pa.Super. 480, 182 A.2d 66 (1962).

Even so, it remains our duty to make a broad review of the record. *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Grillo v. Shuster, supra; Commonwealth ex rel. Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973). After we take full account of the hearing judge's reasoning, still, we must be easy in our own conscience that the judge's award will serve the best interest of the child, or children, in question.

What makes this case so difficult is that one could be easy in conscience whether the award were to the mother *or* father: Both of them love the child, and I suggest that it cannot be argued with any conviction that one will care for the child better than the other.

In this regard, I am not sure from his opinion that the hearing judge meant to suggest that the father would care for the child better than the mother. If the judge is to be so understood, however, I entirely agree with Judge CER-CONE'S appraisal that the suggestion is unacceptable. I cannot imagine what was wrong with the mother taking the child to dinner and out sailing to the contrary, these actions seem natural and proper. Nor does the emotional telephone call reflect upon the mother; the father created the situation that led to the call; in my view, for the mother not to have reacted emotionally would have made me suspect the depth of her concern for the child. As for the mother's failure to enroll the child in Sunday school: It seems to me we must be very careful in appraising such conduct. Without doubt, an important part of a parent's duty is to provide the child a sound moral education. That education, however, may take many forms, and what a hearing judge should be concerned with is not form but substance. To

insist upon a particular form—Sunday school—comes very close to intruding upon the parent's right to spiritual and intellectual freedom. If we look to substance, we find the mother both concerned with, and capable of, providing the child a sound moral education. In short: I share, and join, Judge CERCONE'S appraisal, that on a proper view of the evidence, "we see the evidence as demonstrating a young mother, trying to make a new life for herself and her daughter, by moving to Maryland and obtaining an order to secure the custody of Lea." Opinion of CERCONE, J., at 276–277.

In the old days, in such circumstances a decision would have been easy; by application of the tender years doctrine, the award of custody would have been to the mother. Now, the tender years doctrine is gone, *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977); *Lough v. Charney*, 250 Pa.Super. 311, 378 A.2d 951 (1977); *Commonwealth ex rel. Lee v. Lee*, 248 Pa.Super. 155, 374 A.2d 1365 (1977); *McGowan v. McGowan*, 248 Pa.Super. 41, 374 A.2d 1306 (1977), and I don't regret its departure. Still, the question remains: When both parents are equally able to serve the child's best interest, how *does* one decide which parent should have custody? No doubt in most cases this question need not be answered, for a close examination of the record will show that in fact both parents are not equally able. Here, however, I submit that they are, and that accordingly, we must answer the question I have just posed.

For me, the answer may be found in the father's conduct, first, in ignoring the Maryland proceeding, and second, in refusing to return the child to the mother, not in the child's interest but in his, *i. e.*, so that he could invoke the jurisdiction of the Lebanon County court. I have elsewhere written in condemnation of a parent who thus takes the law into his own hands. *In re Custody of Myers*, 242 Pa.Super. 225, 231, 363 A.2d 1242, 1245 (1976) (SPAETH, J., concurring); *Commonwealth ex rel. Blank v. Rutledge*, 234 Pa.Super. 339, 347, 339 A.2d 71, 77 (1975) (SPAETH, J., concurring and dissent-

ing). *See also* Uniform Child Custody Jurisdiction Act, 11 Pa.Stat.Ann. §§ 2301 *et seq.* (effective date July 1, 1977, which may avoid in the future the problems presented in the case at bar).

I am unable to understand the hearing judge's equation of the father's conduct in ignoring the Maryland proceeding and in refusing to return the child with the mother's conduct in taking the child to Maryland in the first instance, when the parties separated. What else should the mother have done? Her conduct was not in contempt of the law. The father's was.*

For these reasons I concur in the decision that the order of the lower court should be reversed and custody awarded to the mother.

PRICE, Judge, dissenting:

The majority proposes abandonment of a decision of the lower court which comports in all regard to our recent pronouncements in prior custody cases. In addition, the majority places weight on a pro confesso decree entered by a Maryland court without hearing. I find absolutely no justification for the substitution of the majority's judgment in overruling the excellent and well-reasoned opinion of the court below. It is apparently conceded by the parties the newly enacted Child Custody Jurisdiction Act is not applicable to this case, in any event I would hold that it is not. Accordingly, I would affirm the order of the lower court awarding custody to the appellee.

VAN der VOORT, J., joins in this dissenting statement.

* The record before us includes a Maryland lower court order dated August 7, 1978, dismissing the mother's petition to have the father adjudged in contempt for failing to comply with that court's custody award. The court dismissed the petition on the grounds that it was required to give full faith and credit to the action of the Lebanon County Court of Common Pleas. I do not believe this dismissal is relevant to an appraisal of the father's act.