429 A.2d 40

**In the Interest of TREMAYNE QUAME IDRESS R., a/k/a Iyapo Ode Quame R., a minor.**

**Appeal of Mrs. CORDELIA R., maternal grandmother.**

Superior Court of Pennsylvania.

Argued Nov. 10, 1980.
Decided April 10, 1981.

482

Robert P. Deasy, Pittsburgh, for appellant.

Arnold H. Cantor, Pittsburgh, for participating party.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from an order granting custody of a minor child to his foster-mother instead of to his maternal grandmother. We have concluded that the order was within the lower court's discretion and should be affirmed, except in one respect. The lower court made no provision for any visitation by the child with his grandmother. We have concluded that this was error, and we shall remand the case with instructions to enter an order providing for extensive visitation by the child with his grandmother, for it is in the child's best interest that he develop and enjoy a continuing relationship with both his foster-mother and his grandmother.

Tremayne Quame Idress R., the child with whose custody we are concerned, was born on June 15, 1977. Shortly after his birth, Renee R., his natural mother, herself placed him with Mrs. Irene C. Tremayne continued to live with Mrs. C. until June 1978, when his mother took him back to be with

her. Tremayne was with his mother, however, for only a few weeks. In early August the police found Tremayne unattended in his mother's apartment, and on August 9 the Allegheny County Child Welfare Services filed a petition alleging that Tremayne was a dependent child under the Juvenile Act.[1] Tremayne was placed in a shelter, and then in a temporary foster-home under the supervision of Child Welfare Services. After a hearing on August 16, 1978, the lower court ordered that Tremayne remain in the foster-home. On September 27, after the dependency hearing, the court found Tremayne to be a dependent child and ordered him placed with Mrs. C. as his foster-mother. On April 4, 1979, the lower court held a review hearing, after which it ordered that Tremayne remain with Mrs. C. The court also set a date six months later for a second review hearing. However, on April 18, 1979, Tremayne's mother was found dead in her apartment. Mrs. C. and Mrs. Cordelia R., Tremayne's maternal grandmother, then each asked the court for custody of Tremayne. A brief hearing was held on May 23, 1979, and a full hearing on July 16. On July 26, 1979, the court filed a memorandum opinion and an order granting custody of Tremayne to Mrs. C. The order made no provision for visitation by Tremayne with Mrs. R., or for any sort of relationship between Tremayne and his grandmother. The case comes before us on Mrs. R.'s appeal, and we shall hereafter generally refer to Mrs. R. as "appellant," and to Mrs. C. as "appellee."

-1-

■ The lower court's responsibility was to determine what was in Tremayne's best interest:

"It is fundamental that in all custody disputes, the best interests of the child must prevail; all other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well being. *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972)." *Garrity v. Garrity*, 268

1. 42 Pa.C.S.A. §§ 6301 *et seq.*

Pa.Super. 217, 221, 407 A.2d 1323, 1325 (1979). "Among the factors to be considered in determining the best interests of the child are the character and fitness of the parties seeking custody, their respective homes, their ability to adequately care for the child, and their ability to financially provide for the child. *Shoemaker Appeal*, 396 Pa. 378, 381, 152 A.2d 666, 668 (1959)." *Kessler v. Gregory*, 271 Pa.Super. 121, 124, 412 A.2d 605, 607 (1979). *Commonwealth ex rel. Leighann A. v. Leon A.*, 280 Pa.Super. 249, 252, 421 A.2d 706, 708 (1980).

In making this determination, the lower court allocated the burden of proof equally between the two parties. The first issue we must consider is whether this allocation was correct. We have concluded that it was.

This court's analysis of how the burden of proof should be allocated in custody cases, in *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977), has recently been approved by our Supreme Court. *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980); *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980). In *Hernandez*, we identified three sorts of cases: When the dispute is between the parents, or a parent, and the state, in which case the state has a very heavy burden of proof; when the dispute is between parents, in which case the parents share the burden of proof equally; and when the dispute is between the parents, or a parent, and a third party, in which case the third party must show "convincing reasons" why the child's best interest will be served by an award to the third party. How should the burden of proof be allocated in cases such as the present one, in which the dispute is between two "third parties?" Should it make any difference if one of the third parties is a relative and one is not?

■ In *Hernandez* we refused to draw any distinction between relative and non-relative third parties who are disputing a parent's custody:

It is, of course, true that there are two distinct categories of "third parties": relatives, and non-relatives. How-

ever, to draw a distinction in the burden of proof allocated to one category as compared with that allocated to the other would be to indulge in over-refinement, which would distract the inquiry from the essential concern of the case—the child's best interest.[6] In this regard, it may be noted that formerly grandparents might be held responsible for the support of their grandchildren, but the statute was amended to eliminate this responsibility. The Act of June 24, 1937, P.L. 2045, § 3; as amended by the act of May 23, 1945, P.L. 864, § 1, 62 P.S. § 1973. With this loss of responsibility went the loss of a superior right to custody of grandchildren. *See Commonwealth ex rel. Bradley v. Bradley,* 188 Pa.Super. 108, 146 A.2d 147 (1958). This is not to discount the fact of blood relationship altogether; it may undoubtedly create a bond between the adult and child. However, except when the relationship is that of parent and child, how close a bond is a question better left to the hearing judge. Suppose that the third party who seeks custody in preference to the child's mother is a relative who has never had any contact with the child. Next suppose that the third party is a non-relative with whom the child has been living for several years, and that a strong and wholesome relationship has developed between the third party and the child. Comparison of these cases will show that the mere fact of relatedness is not a sufficient reason to impose a lesser burden on the third party relative than on the third party non-relative. Both relative and non-relative should be required to show "convincing reasons" why the mother (in the cases supposed) should not have custody of her child.

[6] Thus, should the burden vary according to the degree of relatedness? Genetically speaking, degrees of relatedness may be stated mathematically. An identical twin is related to oneself as 1 to 1. The relatedness between parent and child is $1/2$; brothers and sisters, $1/2$; uncles and aunts, nephews and nieces, grandparents and grandchildren, half brothers and half sisters, $1/4$; first cousins, $1/8$; second cousins, $1/32$; third cousins, $1/128$. *See* R. Dawkins, *The Selfish Gene* 98–100 (1976). *Id.,* 249 Pa.Super. at 287, 376 A.2d at 655.

Although this was said in the context of disputes between a parent and a third party, we find the reasoning applicable to

a dispute between two third parties, where one is a relative but not a parent and the other is not a relative. As noted in *Hernandez*, "relative" is an exceedingly broad, or diffuse, concept, including relatives both close and remote, and relatives who have known the child intimately and those who have never known or shown any interest in the child. To give a relative who is not a parent a possibly decisive procedural advantage, simply because of being a relative, would in no way serve to support the traditional family, which in the sort of case we are considering no longer exists, and might very well interfere with the determination of what is in the child's best interest. We therefore hold that where the custody dispute is between two third parties, one who is a relative but not a parent and one who is not a relative, the burden of proof should be allocated equally between the parties.

■ Again as noted in *Hernandez*, "[T]his is not to discount the fact of blood relationship altogether." The fact that one of the contesting parties *is* a relative is a fact that the hearing judge must always consider in arriving at the determination of what is in the child's best interest. Kinship ties are still very important in our society. A sense of closeness to relatives can be critical to a child's wholesome and happy development. In any given case the hearing judge may decide that on the basis of all the evidence, the child's best interest will be served by awarding custody to the child's relative instead of to a non-relative.

-2-

We may now examine the evidence presented to the lower court and consider the court's response to that evidence.

-a-

Preliminarily, it is well established that the scope of review of this court in such disputes is of the broadest type. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977); *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976); *In re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978). Although

we will not usurp the fact-finding function of the trial court, we are not bound by deductions or inferences made by the hearing judge from the facts as found. *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). Because of the Commonwealth's legitimate and overriding concern for the well-being of its children, we are required to render an independent judgment based on the evidence and testimony and make such order on the merits of the case as to effect a just result. *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977); *Commonwealth ex rel. Zeedick v. Zeedick*, 213 Pa.Super. 114, 245 A.2d 663 (1968). So as to facilitate this broad review, we have consistently emphasized that the hearing court must provide us not only with a complete record, *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974), but also with a complete and comprehensive opinion which contains a thorough analysis of the record and specific reasons for the court's ultimate decision. *Martincheck v. Martincheck*, 262 Pa.Super. 346, 396 A.2d 788 (1979); *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Absent an abuse of discretion, we will not reverse a hearing judge who complies with these requirements. *In re Custody of White*, 270 Pa.Super. 165, 170, 411 A.2d 231, 232–233 (1979).

The second, full, custody hearing, on July 16, 1979, was well-conducted and complete. The lower court heard testimony from both appellant and appellee; from Dr. John B. Reinhart, a psychiatrist at Children's Hospital of Pittsburgh, who at the request of the court had interviewed both parties and Tremayne; from Ronald Heard of the Westmoreland County Children's Bureau, who had investigated appellee's home; and from Margaret Freeman of Allegheny County Child Welfare Services. It also admitted copies of Dr. Reinhart's written reports of his interviews. A report on appellant's home, prepared by the Marion County, Indiana,

Department of Public Welfare, apparently had already been admitted at the April 4, 1979, hearing.[2]  N.T. at 31.[3]

On the basis of this record the lower court found that both appellant and appellee were "capable of providing Tremayne with a good home." Slip op. at 3.[4]  Of appellant the lower court said:

Mrs. R. (age forty-nine and divorced) is a high school graduate who resides in a suburb of Indianapolis, Indiana. She owns her home and has lived in this home for eighteen years. (t. 9–15)  In addition to her deceased daughter, she is the mother of a thirty-two year old son who is a college graduate employed as a manufacturer's representative, a twenty-nine year old daughter who is a graduate of a school of design and is presently employed as a secretary and a nineteen year old son who is attending a college of music in Boston. (t. 7–9)  Mrs. R. works on the production line of a Chevrolet plant and her income is more than sufficient to meet Tremayne's needs.  (t. 10)

\*     \*     \*     \*     \*     \*

A placement in Mrs. R's home offers several advantages.  First, Tremayne will have close contact with many family members including a six year old half-sister who will be living with Mrs. R. shortly and a seven year old cousin who will also be living in this home.  While blood ties obviously have no meaning to Tremayne at this time, in later years this may be important to him.  Second, Mrs. R. has raised children who are highly motivated and successful in academic and artistic endeavors and we would anticipate that she would motivate Tremayne in the same direction.  Third, Mrs. R. offers Tremayne a substantially higher standard of living.  Slip op. at 3–4.

2.  A transcript of the April 4, 1979, hearing is not included in the record as transmitted to us.  Nor are copies of Dr. Reinhart's reports or the report on appellant's home.  Copies of these reports were, however, included as appendices to appellant's brief.

3.  References to pages in the Notes of Testimony are to the July 16, 1979, hearing.

4.  References to the lower court's opinion are to the opinion prepared subsequent to this appeal and filed on January 22, 1980.

Mrs. C. (age fifty-one and divorced) lives in Westmoreland County. (t. 32) For the last seven years, she has lived in a public housing project and her apartment is described as very clean and adequately furnished. (t. 52) Mrs. C. is the mother of a twenty-five year old daughter who is a high school graduate and recently completed a three year enlistment in the army, a twenty-four year old daughter who graduated from high school and recently completed a computer training program, a nineteen year old daughter who is a high school graduate, and a seventeen year old boy and a sixteen year old girl who are entering the twelfth grade. (t. 31–2, 40–1) The source of her income is public assistance and her activities include serving as an organist on Sundays at her church. (t. 35) Slip op. at 3–4.

The lower court further found that:

It appears that the C. home offers a stable and nurturing environment where Tremayne is well-cared for; that Tremayne's ties to this family are strong, and that the C. family is capable of meeting Tremayne's needs.

According to the testimony of Dr. John B. Reinhart, Director of Behavioral Sciences of the Children's Hospital of Pittsburgh, Tremayne "is certainly in a home where from the observation of this boy's interaction with his foster mother and foster sister, he has been well cared for and adequately stimulated and where affectional ties are strong." (Notes of July 2, 1979 interview with Tremayne and Mrs. C.) This is consistent with the testimony of Ronald Heard, Westmoreland County Children's Bureau employee who supervised Tremayne's placement, that Mrs. C. is cooperative and helpful, that Mrs. C.'s children are respected in the community with one child being a president in the high school, that he is aware of no problems since Tremayne was placed with Mrs. C. and that his information indicates that this is a family that is working well. (t. 51–4)

Mrs. C. is a full-time mother who has successfully raised five children. Tremayne has shown progress while under her care and was found by Dr. Reinhart to be "most

comfortable, well cared for and accepted" (July 13, 1979 Report of Dr. Reinhart). She obviously cares a great deal for Tremayne. She raised him when his mother was incapable of doing so and took immediate steps to have him returned when Allegheny County Children and Youth Services removed him from his mother (t. 32–32), even though the additional welfare grant for Tremayne is insufficient, according to Mrs. C.'s caseworker, to meet Tremayne's expenses. (t. 53) She took Tremayne to Indianapolis to the funeral of his mother (t. 38) and she traveled substantial distances to obtain specialized medical care at Children's Hospital. Slip op. at 5–6.

These findings about appellant and appellee are fully supported by the record. One comes from the record impressed with the capabilities of both parties as parents and the concern and love that they both have for Tremayne. To choose between them was difficult. In explaining its choice, the lower court said:

There are also certain disadvantages to a placement in Mrs. R.'s home. The most obvious is that Mrs. R. and the members of her family are strangers to Tremayne. He has seen his grandmother on no more than six occasions and she has played no role in his life. (t. 22, 28)

Also Mrs. R's work plays a significant role in her life that could interfere with the attention and continuity that Tremayne would receive. When Tremayne's mother moved out of Mrs. R.'s home, she left her daughter [5] (then 4) with Mrs. R. because of difficulties coordinating her work schedule and with the availability of babysitters, Mrs. R. one year later placed this child with Mrs. R.'s aunt. This child has remained in this home for two years but will be returning shortly because Mrs. R. now has more control over her work schedule. (t. 18–19)

Finally, although Mrs. R. knew that her daughter (Tremanye's mother) was having problems, she never took any steps to determine whether Tremayne was being properly cared for. In fact, she did not come to Pittsburgh when

5. This is Tremayne's older half-sister Onika.

her daughter was jailed and Tremayne was placed in a foster home because her daughter wanted to handle the matter herself. (t. 25–8) Slip op. at 4–5.

There is growing concern among courts and child care professionals that established relationships of young children should not be disrupted. *Harashak [Haraschak] v. Harashak [Haraschak]*, 268 Pa.Super. 173, 407 A.2d 886 (1979), *McCourt v. Meyers*, 268 Pa.Super. 152, 407 A.2d 875 (1979). The testimony presented in this case indicates that there is a strong and healthy relationship between Tremayne and the C. family and that there is presently no relationship between Tremayne and the R. family. Dr. Reinhart has testified that Tremayne would be most vulnerable to a change in environment (t. 45) and that any problems that could subsequently arise with respect to Tremayne seeking his roots are less serious than those problems that would result from a disruption in Tremayne's life at this time. (t. 49)

In summary, the sole issue before this Court is the best interests and welfare of Tremayne. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977). The C. family is capable of meeting Tremayne's needs and the stability which this home offers should be protected in the absence of substantial reasons supporting a placement elsewhere. And this Court finds that any benefits from a placement in the R. home clearly do not outweigh the potential harm to Tremayne's growth and stability that may result from removing him from his psychological family. Slip op. at 6–7.

■ The lower court's opinion is a complete and comprehensive one, with a thorough analysis of the record and with specific reasons for its decision. Absent an abuse of discretion, we will not reverse the decision. *In re Custody of White, supra.*

-b-

Appellant contends that the lower court did abuse its discretion, in three respects: in overemphasizing the importance of stability for a child as young as Tremayne; in

separating Tremayne from his older half-sister; and in not giving sufficient weight to the familial relationship between her as Tremayne's grandmother and Tremayne.

-i-

■ We have said that when a child has lived a considerable period of time with one party, the hearing judge is "required to consider the advantages and risks of a change in custody." *Pamela J. K. v. Roger D. J.*, 277 Pa.Super. 579, 592, 419 A.2d 1301, 1307 (1980):

> This court has noted the importance to a child's development of a stable relationship with an established parental figure and a known physical environment. *Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979); *Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Sweeney v. Sweeney*, 241 Pa.Super. 235, 361 A.2d 302 (1976); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). "There can be no question that stability is important to a child's welfare, and that in deciding who should have custody of the child it will therefore always be essential to consider how long the child has spent with [the parties]." *In re Hernandez*, 249 Pa.Super. 274, 296, 376 A.2d 648, 660 (1977). A child above the age of two may become strongly attached to those who stand in a parental relationship and who has tenderly cared for her, *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 89, 369 A.2d 821, 824 (1977), so that to break the bonds of affection " 'may result not only in the child's unhappiness, but also in its physical injury.' " *Commonwealth ex rel. Kraus v. Kraus*, 185 Pa.Super. 167, 175, 138 A.2d 225, 229 (1958), *quoting Commonwealth ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 66 A.2d 300 (1949). Because of the child's need for stability in the early years it is frequently wise to delay a change of custody until the child is older. *McCourt v. Meyers*, 268 Pa.Super. 152, 407 A.2d 875 (1979). *Id.*, 277 Pa.Super. at 592, 419 A.2d at 1307.

*And see Ellerbe v. Hooks, supra.*

At the time of the lower court's decision, Tremayne was just slightly over two years of age. Appellant argues that

in the case of a child so young, we should not attach much weight to the factor of a stable relationship with a parental figure. In support of this argument, appellant notes that we have emphasized the importance of such a relationship only in cases in which the children were considerably older than Tremayne, and that at the time of the lower court's decision, Tremayne had only "just reached the age when he would begin to form the attachments which the courts have found necessary to protect." Appellant's Brief at 13. She particularly draws our attention to *Commonwealth ex rel. Cutler v. Cutler, supra,* in which we said:

> Young children, particularly those under two years of age, quickly form attachments if treated kindly. Above the age of two, children become strongly attached to those who stand in a parental relationship and who have tenderly cared for them. "Bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness but also in its physical injury. . . ." *Commonwealth ex rel. Kraus v. Kraus, supra,* 185 Pa.Super. at 175, 138 A.2d at 229, *quoting Commonwealth ex rel. Children's Aid Society v. Gard, supra,* 362 Pa. at 97, 66 A.2d at 306. *Id.,* 246 Pa.Super. at 88–89, 369 A.2d at 824.

■ Appellant is correct in saying that the cases that have emphasized the importance of a stable relationship with a parental figure have involved children older than Tremayne. Some of these cases have suggested in *dictum* that a concern with stability might be less necessary with regard to children under two years of age. *See, e. g., Pamela J. K. v. Roger D. J., supra.* The origin of this dividing line appears to be *Commonwealth ex rel. Children's Aid Society v. Gard, supra,* which involved a child five and one-half years old. There, our Supreme Court said:

> A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two

years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury. Even dogs which have been separated from masters to whom they are attached have been known to go into physical decline and sometimes to die as a result of that separation. *Id.,* 362 Pa. at 97, 66 A.2d at 306.

These words, however, were written thirty-two years ago. We no longer so lightly assume that very young children will weather drastic changes in environment without psychological damage.[6]

Appellee has been the person whose presence has been the most continuous and stable in Tremayne's life. Tremayne has established close emotional ties with her and her family. In reporting on his July 2, 1979, interview with Tremayne and appellee, Dr. Reinhart stated that Tremayne "is certainly in a home where from the observation of this boy's interaction with his foster mother and foster sister, . . . he has been well cared for and adequately stimulated and where affectional ties are strong." Also, Dr. Reinhart testified that

> from the psychological standpoint, a two year old is probably the most vulnerable to a change in environment, and there is potential for disability in a sense to his inability to tolerate the change. This little boy also has had the

---

6. Some authorities, particularly those with a psychoanalytic orientation, take the position that continuity is absolutely critical, particularly in very early childhood. *see, e. g.,* J. Bowlby, Attachment and Loss, Vol. I: Attachment (1969), Vol. II: Separation, Anxiety and Anger (1973); J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interests of the Child, especially at 31–52 ("On Continuity, a Child's Sense of Time, and the Limits of Both Law and Prediction") (1973). Others dispute this, maintaining that children are developmentally much more resilient. *See, e. g.,* A. and A.C.B. Clarke, Early Experience: Myth and Evidence (1976); J. Kagan, R. Kearsley, P. Zelazo, Infancy: Its Place in Human Development (1978): M. Rutter, Maternal Deprivation Reassessed (1972). We are not required to settle this scientific dispute. It is enough to say that continuity is an important consideration at every age.

difficulty of having several changes already in his first two years, and I think it would not be good for him to be moved again. N.T. at 45.

It is my opinion that the boy is tiny and at an age where he would not be able to make the adjustment. I think that [appellant] has been a good parent, and I'm sure that she would make every effort to do a good job with this child, but I think it would be something that [Tremayne] would not be able to handle. N.T. at 48.

Dr. Reinhart did testify that children adopted when very young frequently encounter problems as they grow older because of their wonder about their natural parents and their roots, N.T. at 47–48, but he said that nevertheless, on balance he thought any problems Tremayne would face later in life because of having been placed with appellee would be less serious than the difficulties he would encounter now if his custody were changed. N.T. at 48–49.

■ On the basis of the record before us, we believe that the lower court did not overemphasize the importance of preserving a stable relationship between Tremayne and appellee.[7]

-ii-

In arguing that the lower court should not have separated Tremayne from his older half-sister, appellant refers us to the principle, which is stated in *Albright v. Commonwealth ex rel. Fetters, supra,* 491 Pa. at 327–328, 421 A.2d at 160–161, that:

It has always been a strong policy in our law that in the absence of compelling reasons to the contrary, siblings should be raised together whenever possible. *Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Commonwealth ex rel. Steuer v. Steuer,* 244 Pa.Super. 302, 368 A.2d 732 (1976); *In re Custody of Myers,* 242 Pa.Super. 225, 363 A.2d 1242 (1976); *Commonwealth ex rel.*

---

7. We are concerned, however, that the lower court appears to have held appellant responsible for the limited contacts she had had with Tremayne. *See* discussion below.

*Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973); *Commonwealth ex rel. Sissel v. Sciulli,* 216 Pa.Super. 429, 268 A.2d 165 (1970); *Commonwealth ex rel. Martino v. Blough,* 201 Pa.Super. 346, 191 A.2d 918 (1963); *Commonwealth ex rel. Johnson v. Johnson,* 195 Pa.Super. 262, 171 A.2d 627 (1961); *Commonwealth ex rel. Reese v. Mellors,* 152 Pa.Super. 596, 33 A.2d 516 (1943). This principle is in no way diluted by the fact that the third child in this case is a half brother.

■ However, while strong, this policy in favor of raising siblings together is not inflexible. It is rather a policy to which the hearing judge must always give careful attention in determining—and this policy is inflexible—what is in the best interest of the child. *See Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977). Here the lower court did give careful attention to the policy in favor of raising siblings together. Thus it stated that one of the advantages of a placement with appellant was that Tremayne would

> have close contact with many family members including a six year old half-sister who will be living with Mrs. R. shortly and a seven year old cousin who will also be living in this home.
>
> While blood ties obviously have no meaning to Tremayne at this time, in later years they may be important to him. Slip op. at 4.

The lower court, however, decided that this and the other "benefits from a placement in the R. home clearly [did] not outweigh the potential harm to Tremayne's growth and stability that [might] result from moving him from his psychological family." Slip op. at 7.

■ Faced with two highly suitable placements for Tremayne, the lower court chose the one in which Tremayne already had deep and established relationships over the one in which he would have to develop new relationships. We do not believe that in striking this balance, the court abused its discretion. To hold otherwise, and say that the court was *obliged* to place Tremayne with appellant as his grandmother, so that he could live with his half-sister and other

relatives, would be to shift the burden of proof in custody disputes such as this one so as to give third parties who are relatives an "evidentiary leg-up" over non-relatives. As we have discussed above, we will not thus shift the burden, for to do so would too likely interfere with the determination of what is in the child's best interest.

-iii-

Although we have concluded that the lower court did not abuse its discretion in awarding custody of Tremayne to appellee, we nevertheless agree with appellant that the court did not give sufficient weight to the familial relationship between her as Tremayne's grandmother and Tremayne. The court appears to have been of the opinion that it had to make an "all or nothing" decision—all to one party and nothing to the other—for in its order it made no provision for any visitation by Tremayne with appellant. Nothing in the law requires such an exclusive award, and we are entirely satisfied from the record here that it was contrary to Tremayne's best interest.

At the hearing appellant described an extensive family. In addition to his half-sister Onika, Tremayne has two uncles, an aunt, and a first cousin. N.T. at 7–8. Although divorced from appellant, Tremayne's paternal grandfather lives nearby. N.T. at 29. Appellant also testified about more distant relatives:

Q. Do you have other family?

A. Yes, my mother and father both were one of six children, and there are uncles and cousins that live around me. There is quite a large family.

Q. Do you visit with each other regularly?

A. I live 60 miles from my mother's family and 60 miles in the opposite direction from my father's family. We visit regularly. We have some of the children and cousins at home or together every weekend.

Q. This family relationship is traditional with your family?

A.  Yes, on both sides actually. We have family reunions and my family is perhaps closer than most families that I have been around. N.T. at 15.

We have elsewhere emphasized the importance to a child's development of being included in such a network of family relationships:

> Except in unusual circumstances, no child should be cut off entirely from one side of its family. *Commonwealth ex rel. Goodman v. Dratch, supra* [192 Pa.Super[ior Ct]. 1, 159 A.2d 70 (1959)]. As said by the New Jersey Supreme Court, "[v]isits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship." *Mimkon v. Ford,* 66 N.J. 426, 437, 332 A.2d 199, 204 (1975). *Commonwealth ex rel. Williams v. Miller,* 254 Pa.Super. 227, 232–233, 385 A.2d 992, 995 (1978).

The question here, therefore, is whether there were such unusual circumstances as to justify the lower court's decision that Tremayne should be cut off entirely from appellant and her side of the family.

As we have mentioned above,[8] the lower court appears to have held appellant responsible for the limited contacts she had had with Tremayne. Thus the court said:

> [A]lthough Mrs. R. knew that her daughter (Tremayne's mother) was having problems, she never took any steps to determine whether Tremayne was being properly cared for. In fact, she did not come to Pittsburgh when her daughter was jailed and Tremayne was placed in a foster home because her daughter wanted to handle the matter herself. (t. 25–8) Slip op. at 5.

Appellant testified that she was originally under the impression that her daughter was caring for Tremayne and that appellee was merely helping her. N.T. at 16–17. She said that she did not discover that Tremayne was living with appellee, rather than her daughter, until three or four

---

**8.** *See* footnote 6, *supra.*

months after Tremayne's birth, and that when she discovered the true situation, she telephoned appellee, and also spoke to her daughter, about whether she might help with the baby. N.T. at 17–18. However, her daughter "said that she would prefer having the baby [there] where she could see him regularly and take care of him herself." N.T. at 18. Appellant further testified that when Tremayne was taken away from her daughter, in August 1978, she again offered to help, asking if she should come to Pittsburgh. N.T. at 25.

A. I asked Renee if she wanted me to come then, and she said she would prefer to handle it herself. She was sure that it was a mistake and everything would be all right. I asked her numerous times after that if she needed me, and she said she could handle it.

Q. So you are telling us that in August of 1978 when your daughter was arrested, that you were made aware of the situation through a telephone call with your daughter from the Allegheny County Jail?

A. Yes.

Q. And at that point you did not think it was important to come to Pittsburgh to try and make arrangements for this child?

A. I though it was extremely important. My daughter asked me not to come because she wanted to handle it herself.

Q. You didn't think that the problems were serious enough that you should come her despite what your daughter said?

A. I thought I should despite her wishes, but my daughter was a grown woman. I felt that I should respect her wishes also. N.T. at 26.

Appellant acknowledged that she did not communicate directly with appellee concerning Tremayne; instead she communicated with her daughter. N.T. at 27.

Q. After all this time weren't you concerned about what was happening with this child? Weren't you concerned that he was living with someone that was a stranger to you.

A. I stated before that I did not like it, but I felt it was important that I honor my daughter's wishes.

Q. You have been pretty much in the background throughout most of this child's life; isn't that so?

A. I suppose it would appear that way to you but that is not how I feel about it. I feel the same way about my daughter as I suppose most mothers feel about their children.

Q. He has grown up for two years without you really playing any part of importance in his life; isn't that so?

A. I suppose it is. Yes, I suppose that is true. I don't like that though. I did what I felt was right at the time. N.T. at 28.

■■■ Looking at the situation with hindsight, we might decide—as appellant herself might—that it would have been better for Tremayne if appellant had intervened earlier. But we see no basis in the record for a finding that appellant was not concerned for her grandchild. To the contrary, the record describes a woman who has raised three other independent and successful children, and who tried to respect her grown daughter's desire to raise her own child. Although the lower court quite properly considered Tremayne's lack of relationship with appellant, in arriving at its decision to award custody of Tremayne to appellee, we find no evidence of such "unusual circumstances," *Commonwealth ex rel. Williams v. Miller, supra,* as justify the court's decision that Tremayne should be cut off entirely from appellant and her side of the family.

The lower court could, and we are satisfied, should, have fashioned an order that would enable Tremayne to be included in appellant's family. This may be accomplished by allowing custody of Tremayne to remain with appellee, while providing for extensive visitation by Tremayne with appellant. Thus Tremayne may get to know appellant, his half-sister and his cousin, who will be living with appellant, and the other members of appellant's family. At the same time, the stability and continuity of his relationship with

appellee will be preserved. Moreover, since by its nature an order in a custody case remains subject to the hearing judge's review, *Dile v. Dile,* 284 Pa.Super. 459, 426 A.2d 137 (1981); *McCann v. McCann,* 270 Pa.Super. 171, 411 A.2d 234 (1979), the lower court may from time to time, as appropriate, consider how Tremayne's development is progressing, and make such adjustments in its order as the evidence indicates. We are confident that the lower court, which has demonstrated its thoroughness and sensitivity, can fashion such an order, perhaps after receiving further testimony. Our confidence is based not only on the demonstrated competence of the court but on the evidence of appellant's and appellee's mutual concern and love for Tremayne. We trust that they will both realize that it is in Tremayne's best interest to have a continuing relationship with each of them, rather than an exclusive relationship with just one, and that they will be able to abide by a reasonable visitation arrangement and work out any difficulties they may encounter.

The order of the lower court awarding custody to appellee is affirmed, but the case is remanded for further proceedings consistent with this opinion and with instructions that the lower court should enter an order providing for extensive visitation by Tremayne with appellant. Either party may take a new appeal from the visitation order.