# In re Change of Name of Steven Robert Richey

*Robert W. Lape,* for petitioner.
*Amy E. Webster,* for respondent.

BRUMBAUGH, *J.,* May 12, 1988 — This court having conducted evidentiary hearing in this change of name proceeding on April 8, 1988, based upon the testimony thereat presented, reasonable inferences therefrom and our incorporation into this record by judicial notice taken of a divorce action and a support proceeding both instituted in this county and involving the same parties, we make the following

## FINDINGS OF FACT

(1) Nila I. Richey (petitioner) and Steven A. Richey (respondent) married on September 1, 1974 in California and to this union two sons were born: Steven Robert Richey on February 8, 1975 and Craig William Richey on May 5, 1977.

(2) Differences between petitioner and respondent resulted in a final separation in 1979, when respondent moved to and since which time he has continued to reside in Dubuque, Iowa, while peti-

tioner has remained in and for the past 13 years has been a resident of Blair County.

(3) Just before moving to Iowa respondent instituted and served upon petitioner, both on August 9, 1979, a complaint in divorce filed to no. 1371 of 1979 in this court on the ground of indignities; although said action never proceeded beyond this point and no decree was ever entered therein, petitioner and respondent were divorced sometime in 1981 in another unidentified proceeding, the former never remarrying but the latter taking a second wife.

(4) From a URESA petition filed by respondent on April 7, 1980 to case no. 83280 with the Dubuque County District Court (First Judicial District of Iowa) it would appear that the two sons aforesaid were with him initially and briefly after the parties' last separation, for by documents forwarded and filed to D.R. no. 328 of 1980 here in Blair County he was seeking support in the amount of $550 per month for himself and said children from petitioner; said petition was dismissed by President Judge Peoples at hearing on June 24, 1980 on the ground that both boys were returned to her custody on May 23, 1980, however.[1]

(5) For the past seven years the boys, Steven now age 13 and Craig age 11, respectively, have lived with petitioner-mother and have been in her actual physical custody, there nonetheless appearing to be no formal decree of any court awarding her such custody legally.

(6) On September 30, 1980 petitioner instituted her own URESA suit to our above D.R. no., seeking

---

1. Petitioner, significantly, admits that she "signed for the divorce" (presumptively respondent pursued another divorce action on no-fault grounds after removing to Iowa) in return for "complete custody," "I get custody."

$320 per month from respondent for herself and the boys; by the time it came to hearing on November 24, 1980 as case no. 83448 in Dubuque County District Court the parties had entered into an agreement for child support in the sum of $30 weekly, commencing December 1, 1980, which was made an order of that court.

(7) By the time of the above support order petitioner had taken up cohabitation, in a paramour relationship, with one Tobias Jason Claycomb, a single man whom she has never married but by whom she now has a 16-month-old baby, Tobias McClain Claycomb; petitioner, Mr. Claycomb and the boys have now resided together for the past approximately eight years.

(8) Petitioner herself has never adopted or used the surname of Claycomb and is apparently known throughout the rural community of Claysburg by her first married surname of Richey (her maiden name apparently being McCullough).

(9) In accordance with the support order of almost seven and one-half years ago, which has never been modified or terminated, respondent continues to pay $30 per week for the boys' support; although for a time he may have been in default, he apparently has made regular payments over the last several years, either voluntarily or by wage attachment.

(10) Since custody of the boys was accorded to petitioner in 1980 there were apparently two periods when respondent had significant personal contact with them, the first occurring in 1981 and the last in 1983, when he had temporary custody for two weeks in Iowa and declined to return the boys to petitioner, which forced her to travel to his home to regain them; while it has been almost five years since he has seen either lad, it is obvious that

petitioner would not willingly have surrendered temporary custody to him out-of-state again.

(11) Since 1983 respondent has made no attempt personally to contact either boy, has not telephoned or written to them or sent to either any special occasion cards or gifts; by the same token, neither boy has been encouraged to initiate any contact with respondent.

(12) Both boys know that respondent is their real father but would feel more comfortable using the last name of petitioner's paramour because of the actual live-in family situation, their affection for him and because petitioner has given implicit encouragement to this change.

(13) While the boys are commonly known to friends and acquaintances by the surname of Claycomb and while they have wrestling awards engraved with that last name, their school records still officially carry them as Richeys and that is the name which the older boy, Steven, actually used in kindergarten and until he started first grade in 1980; there is no question that the Claysburg-Kimmel School District is aware of the duality of the situation.

## DISCUSSION

A basic and sound reason for declining approval of the proposed change of surname is that it will serve to drive an additional wedge between Steven and Craig and their natural father and to further dissipate a root or blood heritage. See *Rounick's Petition*, 47 D.&C. 71 (1942). We recognize that respondent has not seen the boys for years and that he has not contacted or communicated with them since 1983, but may this not be in part attributable to a feeling of discouragement over the distance

between them and the fact that their mother as the custodial parent controls their relationship with him? After the problem over his exercise of temporary custody in 1983 she had decided "there would have to be something done about [him] taking them again . . . we'd have to work something different out. They'd [the boys] have to stay around Pennsylvania." It is obvious that petitioner has never suggested that either Steven or Craig initiate a contact with their father, despite her knowledge of his constant residential address. That the blood association is important to respondent is evident and emphasized by the fact that his firstborn carried not only the paternal surname but also the same first or given name as his father.

Although in a visitation context, what we have previously noted concerning non-custodial parental rights also finds application in the instant matter:

"[S]ince no custody decision should be sanctioned which would effectually cut a child off from one side of the family, sufficient visitation should be reserved and provided to safeguard that paternal tie and to prevent estrangement from the non-custodial blood. See *In Interest of Tremayne Quame Indress R.*, 286 Pa. Super. 480, 429 A.2d 40 (1981).

"[The child's] mother has now brought another potential 'father-figure' into her home, together with his local family and now a second child, and so further diffusion is inevitably created — there are more people for [the child] to be interrelated to and with. We are not critical of this natural consequence of divorce or attempting to minimize the prominent role which a stepfather may assume with regard to a child, but it is also to be expected that a concerned father will view the custodial second husband's position as a competitive or conflicting status and will take steps to keep from being literally or figu-

ratively 'squeezed out of the picture.' Cf. *Klein v. Sarubin*, 324 Pa. Super. 363, 471 A.2d 881 (1984). This situation flames a father's fear of vulnerability to an 'out of sight out of mind' isolation. . . . The observation of Judge Woodside in a different context is nonetheless here applicable:

" 'Visitation rights of a parent not in custody have long been a matter of concern to the law of this commonwealth. They must be carefully guarded for when parents are separated and custody is placed in one of the parents, there exists a danger that the parent having custody of the child may use his or her advantageous position to alienate the other parent from the affections of the child.' *Commonwealth ex rel. Lotz v. Lotz*, 188 Pa. Super. 241, 246, 146 A.2d 362, 364 (1958). [The child] states that she calls her stepfather . . . 'Daddie,' and [her mother's] testimony was that [the child] 'respects and loves Dave and calls him "Dad," ' a step which she has 'encouraged.' We do not necessarily fault this practice if it is promotive of the . . . household interrelationship and makes [the child] feel more comfortable; we would nonetheless hope it is suggested in a supplementary, and not a substitutionary or superceding, manner, and that on occasion the child is appropriately reminded of the need to love her natural father, too.[6]"

"6. [The mother] testified that [the child] had never asked to call [the natural father], but that she would 'never object' to [the child] telephoning him. The court would point out that a mutual benefit could result if [the mother] would arrange for [the child] to call [the natural father] regularly — for example, on a given evening once a week: such arrangement (a) would protect [the natural father's] rightful status, (b) bridge a gap of communication between father and [child] . . . , all in the interests of their [child's] feelings of security." (bracketed words supplied) (footnote part of quote)

*Iacaboni v. Redline,* unreported opinion filed to no. 2241 C.P. 1982 (Blair Co. 1985), at 10-12.

While Mr. Richey was not personally present at hearing, there could be various reasons for his absence (objections of a second wife, employment conflict, illness); his interest and concern is nonetheless evident from his retention of private local counsel, furnishing her with factual information (which proved correct) to prepare a written response to the allegations of the petition and having said counsel represent him at the hearing itself.

The foregoing reason standing alone — the potential of a name change as an instrument of alienation and disassociation from an objecting noncustodial parent — may be insufficient ground to deny the request and lack force when asserted by a parent shown previously to have abandoned or forsaken the children, but such is certainly not the case here. For a substantial period of time, indeed during the major portion of the parties' separation, respondent has been paying child support (see *Dibacco Petition,* 32 D.&C.2d 90 (1963)); moreover his past actions and the current contest are manifestations of continuing hope for a meaningful personal relationship with the boys eventually, which a practical alteration of identity through surname change could well atrophy. We do not wish to deprive him of another link in the chain which may stave off estrangement from his sons. See *In re Niedbala, a/k/a Hickey,* 36 D.&C.3d 397, 403 (1985).

There are, however, other bases why we do not look favorably upon the effect of the subject petition, were its prayer granted. In *Hurley Name Case,* 38 D.&C.2d 146 (1965) a divorced woman had

applied for a change of her married surname and that of the three minor children of that marriage to the last name of a married man with whom she was admittedly and openly in romantic liaison; in refusing her request the court stated at 148:

"[W]e also conclude to grant the request would not comport with good sense, common decency and fairness to all concerned and to the public good.

"To grant the prayer of this petition, in our opinion, would be to not only give court approval to an obviously improper subterfuge, but also approving admitted illegal conduct."

Here, it is true, both petitioner and her paramour were apparently unmarried throughout their relationship, so no adultery is involved, much less any *unlawful* conduct since the Crimes Code of 1972 went into effect in mid-1973. Prior thereto, however, the law was clear:

"Fornication has been an offense for centuries and was a violation of the law both before and since the Penal Code of 1860, as well as the Penal Code of 1939, 18 P.S. §4506." *Commonwealth v. Sarricks,* 161 Pa. Super. 577, 582, 56 A.2d 323, 325 (1948). While it is the right of choice of petitioner and her paramour inter se, such live-in situations are still not accepted relationships within the general moral fabric of our society. We will not condone an amoral relationship between petitioner and her non-husband and, in effect, say to these boys that a court of law approves of man and woman living together in a state of sexual intimacy out of wedlock.[2] We

---

2. Cf. *In re Dillen,* 283 Pa. Super. 26, 423 A.2d 426 (1980), wherein the appellate court reversed the lower court's denial of the name change. There, although petitioner was illicitly fathered by one not his married mother's husband, upon the

need neither sanction nor affirmatively recognize an interrelationship in which the parties are reluctant to undertake a mutual and long-range commitment of responsibility through some type of formal civil or religious marital bonding. What is there to prevent either Ms. Richey (with the boys) or Mr. Claycomb from simply walking out of the common residence, deserting the other and leaving Steven and Craig with a surname to which they would suddenly have no practical tie, by blood, marriage or personal association?

Any contention that a disallowance of the request would be a source of embarrassment to the boys is totally deflated by the fact that petitioner herself has never assumed, legally requested or held herself out publicly as having the surname of Claycomb. There is nothing to show that Steven and Craig are not generally acknowledged to be her sons, so why should they have a last name at variance with hers? It is anomalous for them to be known by a surname other than that still shared by both of their divorced parents! Nor will the boys suffer any emotional trauma by our decision; this is not a situation of sudden revelation to either of them that they are not who they thought they were, for both have known about and who their real father is for at least several years.

---

mother's divorce she married petitioner's real father. This case is readily distinguishable from the instant matter, not only because it involved a second marriage but also because in the former the 12-year-old petitioner wanted his surname changed for the logical purpose "to reflect his true parentage," while such a change in the matter before us would *conceal* such parentage; moreover in *Dillen* the first husband, whose surname petitioner bore, neither appeared in nor contested the action.

We also question the ability of either boy to project the consequences of a decision such as this with maturity, the older barely being a teenager and the other two years younger. See *Browne v. Burnett*, 28 D.&C.3d 533 (1984); *In re Bennetch*, 13 D.&C.2d 308 (1957). Every indication is that the name change has been at the urging of petitioner, however subtle or indirect, perhaps spurred by the birth of her third son, this one by Mr. Claycomb, early last year. While the boys are certainly and understandably receptive to the idea, it has been planted, watered and nurtured by her and her family (i.e., the Bible presented to "Craig Claycomb" by his maternal grandmother). Petitioner tellingly testified:

"[H]e (Craig, the younger boy) came to us about this Richey and Claycomb and I explained to him, you really are a Claycomb[3] — a Richey — but if you want to go by Claycomb, you know, he just, he's always been around the Claycomb family. . . ."

Putting aside the uncontradicted testimony that the last name "Claycomb" is designated on the boys' report cards (we note, however, that neither a past nor current report card for either boy was introduced or even presented, which would have been the best evidence of the names in which they are issued,[4]), the fact remains that they are still Richeys on the official registration rolls of the Claysburg-Kimmel School District:

---

3. A slip of the tongue which clearly reveals to us that petitioner has aided and abetted the proposed change in the boys' eyes.

4. We judicially note the common practice and procedure of most school districts to surrender report cards to the permanent possession of the student and/or his custodian by the end of each school year.

"The school, I guess, had mentioned to them that they weren't legally Claycomb, that they'd have to start going by Richey. . . . That's why, I said we'll see if we can't get something done so that you can go by Claycomb. . . ."

No testimony was offered as to how the boys are enrolled or registered for church or medical purposes.[5] That petitioner was less than candid with this court is manifested by her initial affidavit that the boys had had no contact with respondent since 1981, which she conceded was a two-year error at hearing in the face of the father's reply pleading, and also by the boys' apparent contradiction of her bald assertion that "they wouldn't know him [respondent] to see him," Steven asserting that he "sort of" recalls what his father looks like and Craig testifying he remembers his father a "little bit." At this stage and at their age we cannot fully ascribe as their own informed and considered wish the boys' expressed desire to go by the "Claycomb" surname.

Even were we to conclude that 13-year-old Steven might be old enough to decide for himself what his last name should be (the real question being, nonetheless, had he so independently decided?), we find that 11-year-old Craig is not; since both should bear the same surname at this point as full blood brothers, we would in any event be unwilling to grant the request on behalf of only one child. Acknowledging that such age of maturity and knowledgeability may vary with the child and his

5. Petitioner tried to create an inference that the boys are attending or members of a church under the Claycomb name, but the younger boy stated that the Bible which he received was inscribed, not by any church, but by his mother's mother, and that he doesn't go to church anymore.

circumstances and experience and that this commonwealth has not established by statute any fixed minimum age for this purpose, we nonetheless note a Florida case holding a 12-year-old boy incapable of making an intelligent choice as between his mother's maiden and his father's surnames. See *Lazow v. Lazow,* 147 So.2d 12. A pre-teenager is, in our judgment, "a very youthful minor." See *Petition of Falcucci, infra.*

The oft-cited opinion in *Petition of Falcucci,* 355 Pa. 588, 591, 50 A.2d 200, 202 (1947) established the following:

"In granting or refusing the petition [for change of name] after due hearing and notice *the court has wide discretion.* If there is 'lawful objection' to the granting of the petition it will be denied. If there is no such lawful objection the petition [may] be granted. Under certain circumstances a court even in the absence of lawful objection should deny such a petition. . . . Whenever a court has discretion in any matter (as it has in the matter of a change of name) it will exercise that discretion in such a way as to comport with good sense, common decency and fairness to all concerned and to the public." (bracketed words the court's; italics supplied)

We have given various reasons for our decision of denial, any of which is sufficient to support the same in its own right and of itself. We now arrive at the following

## CONCLUSIONS OF LAW

(1) There is no "lawful objection" to the grant of the prayer of the subject petition (see *In re Dowdrick,* 4 D.&C.3d 681 (1978); *Petition of Rocuskie,* 41 Northumb. L.J. 80 (1969)).

(2) Petitioner has not met her onus of satisfying this court that a grant of the prayer of the petition would be in the best interests of either child.

(3) To grant the prayer of the petition as to either child or both children would constitute an abuse of our discretion.

Accordingly we enter this

## ORDER

And now, May 12, 1988, the prayer of the petition for change of name is denied and refused, and the petition is dismissed.